from El Paso policy that prohibits his religious speech on public streets, public sidewalks, part of a public park, in the Union Plaza area of downtown El Paso during the city's art and farmers market. This El Paso policy that generally bans First Amendment activities outside of booths and specifically bans religious proselytizing whether inside or outside of booths is unconstitutional, violating his right to free speech, free exercise of religion, and due process. In regards to his free speech claim, there's no question that his speech is entitled to constitutional protection. No question about that. No question that these areas where he wants to speak, these public ways in the Union Plaza area, they are all traditional public forum and they remain so during the course of the market. So in these circumstances, as such, with this restriction, it can only stand if it's found to be content neutral, narrowly tailored to serve a significant government interest, and leaves open ample alternative channels of communication. Are they making everyone, you don't have to be silent to be in this market, do you? No, you don't. You do not. Banning all First Amendment activity, you can keep talking as long as you're not talking about religion or politics. Or fundraising. That's exactly right, Judge Yarbrough. So how are they, how in the world do you say this is about religion or politics? I guess I'll ask them that. They're not telling everyone they have to be silent. So you can talk about other things. Right. Except the things that are in the heart of the First Amendment. That's right. And they have what they call a ban on First Amendment activities. And what they have briefed is they tie it to what would be potentially disruptive conduct. So then they discern, okay, is this particular activity, because they don't stop. As you mentioned, they don't stop conversations. They don't tell people to be silent. There's some issue about what is the policy, because they've got multiple versions of what this policy is, I think. And so what do you believe the policy is in the record? I believe the best evidence of the policy is what was stipulated, found in paragraphs four and five, the stipulated facts. That's on page, I believe it's 63, the record excerpts. And what that states is that states that they have this general prohibition of First Amendment activities, but in this they specifically ban, and expressly, religious proselytizing, fundraising, and political campaigning. When you say they have a general prohibition, it doesn't say in there of First Amendment activities. That's your added, or does it actually say that? It actually says that, yes, Your Honor. And of First Amendment activities. I thought it listed out the activities. Yes, Your Honor. So I guess there was a Zoom hearing with Judge Cardone, correct? Yes. And then she issues the 35-page opinion. She does. You know that opinion well. When I read it, she actually seems to describe the law of Reed versus Heffron correctly. I think she does. Yeah. So the case reduces to she makes a factual finding that the actual policy is one against disruptive people, regardless of what they say. And if that were the record, you would agree that would be in the Heffron standard and it would require only intermediate scrutiny, correct? She referred to it as a calling out policy. If it prohibited anyone from calling out. Is this just that she missed the record, just belies what she found factually, but it's not legal error? Well, she mentioned that she believes she was at liberty to rewrite the policy, yes. But so am I right? There's no legal error other than her application of the facts to the law? I would say with going further, although it really wasn't part of the record because there was no dispute between the parties as far as what the policy is, but a calling out policy I think would bring with it its own constitutional concerns. She relied on the Fife affidavit more than the about the market document and the letter to your client? Actually, I think what she relied on was a comment by counsel during the Orr argument where he mentioned there was a calling out policy for people who were in booths. And I believe in her attempt to rewrite the policy, she said, well, this policy, this calling out policy, is constitutional. Now, as mentioned, I think that's debatable whether it's constitutional or not. Regardless, the joint statement of facts, as Judge Elrod asked, commits to sort of there was a facial ban on specific speech. There's no question. There's never been any dispute about that. What do you think? How did she miss that? I believe what she was considering constitutional avoidance. She was trying to avoid a constitutional concern. And so when she heard the comment about a calling out policy, in her view, and I'm speculating here, Judge, is that she decided that would be the policy and then upheld that. That's my perception of it, Judge. Now, everybody agreed that this affair, whatever you want to call it, required someone who wanted to participate to get a booth or something like that. Will we find in the record any evidence that your client applied for a booth? No, Your Honor. He wasn't really interested in seeking a booth. What he wanted to do was speak on the public ways that were traditional public forum. Is it correct that any activity that did not have a booth was prohibited during the fair? What the record shows is that First Amendment activities, as determined by the city, are prohibited outside of booths, and that religious proselytizing is prohibited whether inside a booth, whether you had a booth, or outside the booth. So that was prohibited in its entirety. Counsel, but that's what I thought we talked about, that First Amendment activities may say on their face they're prohibited, but you don't have to be silent when you're walking from booth to booth. There's no evidence in the record that they made everyone be silent if they're a visitor to booths. I think that's the practical reality of it, Judge. But that's their wording, is that they bar First Amendment activities, and that's what's been stipulated, too. So then I think it determines, okay, well, how do you define that? First Amendment activity, you know, that's broadly defined. Well, I guess I'll ask them. But there's also the free exercise. We're talking about whether the court ruled correctly under the law. Do you think the court ruled correctly under the law on the free exercise claim? I do not. Can you explain that to us? Certainly. Because the policy specifically mentions religious proselytizing as a prohibited activity, that's why it's a free exercise violation, because there's no dispute that for Mr. Denton, that is an important aspect of his Christian faith, that he wants to evangelize, that he wants to proselytize, and that you have a city rule that prohibits that very activity. So even though the free exercise of religion case law is somewhat in flux, I think the Supreme Court is considering or seems to be considering whether Smith is still good law or not. I think whether it's Judge Jenner-Smith, which we currently have, or maybe some extension of it. Smith can be good law, and there's still Trinity Lutheran. Is it there? I agree. I think either Smith being good law or not, because this is so blatant and as facial, that it's unconstitutional. Religious proselytizing. So it's ruling out religion for special disability. That's right, Judge. Religious expression. Yes, Your Honor. You haven't analyzed the free exercise aspect much here. In other words, you cite Trinity Lutheran, don't develop it. There are some nuances to that. And here, I'm imagining the opposing counsel will get up and say, how much did it burden him to be able to continue proselytizing three feet out from the entrance? In other words, the free exercise analysis is more complicated. I didn't see it briefed substantially in your brief. Your Honor, I believe that's because the violation is so clear here. Or it could be attorney failure for failing to brief better. But I do believe that we have a clear violation in the sense that you have a rule that specifically eliminates an indisputable aspect of his religious faith. This is a two-block, three-block area? I would say, yes, Your Honor. It's about a three-block area. It's founded by four public streets and a public park. If strict scrutiny applies, you prevail under free speech analysis, which the Reid heffron that seemed to attain most of the attention. Would we remand for compelling interest narrowly tailored? In other words, they assert, well, how's an ambulance going to get in if everybody can stand up on their pedestal in this tightly crowded area? So the analysis would have to be done in the first instance or not? I don't believe so, Your Honor. I believe the court has before it sufficient record. But are you disputing that there is a compelling interest in being able to get an ambulance in there? I would say they mentioned public safety, and that is a compelling interest. So then you would prevail? So get past that, you're focused on narrow tailoring? I am, Your Honor. And also really in the context, can you say that handing out literature is really a public safety issue? So it really does beg the question. So in the abstract, the interest is significant, it is compelling. But in the context, is it really one that's pertinent?  She never did that analysis. No, Your Honor. At least I don't recall her really doing it. She did have a free exercise analysis and a free speech analysis. But I do not recall really digging into that. Does this allow, well, apart from the fact that it says no First Amendment activities, does this statute on its face or this ordinance on its face allow people to speak anti-religious conduct, comments? On its face it does, because it only specifically eliminates religious proselytizing. So the practical reality is even though it bans First Amendment activities, it allows First Amendment activities. And so while religious proselytizing is necessarily the promotion of a certain religion, it's not an argument against. So it would seem at least on its face. Now, I would think that according to their own definition and how they have enforced it, that if it was anti-religious, if it became disruptive, then I think they would get involved. Okay. And there's no testimony in this record, correct? No sworn testimony. There's a somewhat informal hearing, perhaps, with there's no witnesses per se. There's a verified complaint from the plaintiff. There's a sworn affidavit from the plaintiff. There's also a sworn affidavit from Mr. Fife from the city. At the hearing, there was no live testimony. There were statements made by counsel, but no live testimony. Judge Elroy, I'm not sure how to really describe it. Instead of characterizing it, I'll just describe what happened. As Judge Iggeson mentioned, it was by Zoom, and there were two witnesses for the city, but neither were sworn in. But during the course of the argument, one of the witnesses was asked by counsel a question, and he answered it. Did you say, well, I need to cross-examine them because it's not really fair? If you're going to put them on, are they testifying or are they just talking? I did not say that, Judge. Okay, well. Do you dispute the description of the encounter? It seems like that wasn't disputed. In other words, when they came up to your client. I don't think there's much dispute. I think my client would probably put it in somewhat of a different way, but I believe there's really very little dispute between what happened out there and the reasoning why he was ejected. But you do dispute that there's a calling-out policy versus a written First Amendment policy that bans privileges, proselytizing, and political speech. I do. But as far as what was applied to Mr. Dinn, I certainly do, Judge. I believe I might be spreading my arm in rebuttal, but I'll be glad to answer any other questions that the Court may have. I guess I wonder, does the record reflect what they do with panhandlers? There is. I'm not sure I'm aware of any dealing for panhandlers. They do have buskers, but the buskers go through a process in which they. . . violate how she really perceives the policy here. I don't know. I don't think the record really speaks to that, Your Honor. Thank you, counsel. Thank you. We just have time for rebuttal. Mr. Reed. If it pleases the Court, Evan Reed, Assistant City Attorney for the City of El Paso. We're here today because the trial court correctly denied a motion for a preliminary injunction. The primary issue before this Court is whether an appellant is entitled to that extraordinary remedy. In order to be entitled to a preliminary injunction, he has to show four things. That he's substantially likely to prevail on the merits. It does. I think, at least from my standpoint, that we'd almost stop there, right? I guess I have a bunch of questions about statements in your brief. You said that this market is, quote, not a First Amendment fair. Right. What did you mean by that? The market itself is a small area, a couple of streets, every Sunday. I know what it is geographically. What do you mean it's not a First Amendment fair? Oh, okay. It's a public forum. You aren't disputing that. Correct. So people can say what they want to say? Correct, Judge. And yet the written policy, even the joint statement, says you agree that there was a content restriction on these categories of speech, including religious proselytizing. So I disagree that it's content-based. I believe that it's really – what's happening here, I guess the core premise of this case, is that there are two versions that counsel are disputing about what the actual policy in question is. The one's in writing, isn't it? Yes, but that – The one's in writing says it bans all First Amendment activities, right, especially religious proselytizing and political speech. That would be the about the market document. And that document about the market, that is essentially a policy that talks about what vendors, organizations, buskers, people who participate in the market – the joint statement is talking about the non-exclusive list of disruptive – I'm sorry, of disruptive activities that the market is intentionally intending to move out of its way. So – Religious proselytizing is disruptive, correct? Yes, Your Honor. It is disruptive in the context of the time, place, and manner that it's taking place. Is God is dead disruptive? No, Your Honor, and – Why is saying – So, if I'm – This is the reason, or some other religion, Mohammed is the – I'm not trying to single out Christianity. But why is one side of the statement – that is viewpoint discrimination, isn't it? To say you can say God is dead, but you can't say God is alive and resurrected? So – That's viewpoint discrimination. Yes, Your Honor, that would be facial viewpoint discrimination. That's not what the city is intending to do here. You told us that you could say God is dead when you're talking in the – Yes, Your Honor, you could. Okay, so why? I thought if an atheist gets up and says God is dead, that sounds like proselytizing to me. You would agree with that, too. So, what – if I could explain. So, as I said, there's two versions of the policy that we're talking about. There's a policy that was applied to Mr. Denton, and there's this about the market document. Again, that document only talks about people who are applying for a booth space. It only talks about people who are applying to be a busker, who are taking part in the fair. There's nothing in the record to show that Mr. Denton did any of those things or was interested in applying for a booth space or being a vendor. So the core premise of this case, essentially, is this is a case that we believe is about whether the government can use a reasonable time, place, and manner restriction to prevent a preplanned public event from being disrupted by non-event-related activities. If it were just disruption, here's my real problem. It looked like Judge Cardone, in her opinion, said that the parties stipulated that the policy prohibits First Amendment activity that causes disruption, quote, regardless of content. Yes. She said that. So – But neither of the supporting documents, she quotes, say that, right? The first one is defenses. Well, right? They didn't stipulate to your defenses. Right. So would you agree with me that the supporting citation she gave for the fact that the parties stipulated regardless of content doesn't support that statement? So are you asking – She makes the statement that the parties stipulated that disruptiveness is banned, quote, regardless of content. Yes. But then she cites two supporting exhibits. Neither of them supports that. It doesn't look like Mr. Denton ever stipulated that the policy was regardless of content. His position, relying on the written items, is that it's always been based on content. Correct. That's – So she was wrong in her factual support for what is the critical assumption. She says the parties stipulated. Did Mr. Denton ever stipulate? No. Mr. Denton did not stipulate. Okay. So is the district court wrong with that statement? That statement, I believe so. Mr. Denton didn't stipulate that this was solely content-based. It's his version of events that this is a content restriction. That's a pretty big mistake at the premise of her whole case. I think so, Judge, but I don't think that it's fatal to our case. Why do you still win? So, as I said, I believe that this – the core premise of this case is really that the government can use reasonable time, place, and manner restrictions to control what is essentially a preplanned public event to make sure that it's not disrupted by non-event-related activity. We believe that reasonable time, place, and manner restriction requiring non-event-related activities to move a short distance out of the way of a public event is justified without reference to the content of any message. We believe that it's narrowly tailored to serve a substantial governmental interest in, as Judge Carnone said, preventing disruption of market commerce and ensuring safety. We also believe that it leaves open ample alternatives for speakers to deliver their message to the same or substantially similar audience. Do you think that the document is really – has some significant problems? The about-the-market document, Judge? Yes. Yes. Yes. It puts out the core protections of the First Amendment to say those are specifically banned. Isn't that an – So, yes, Judge, and I – that's – but that's been the crux of this case. Essentially, we believe that the policy is embodied in the affidavit of Benjamin Fife in the record at 189. We think that's the best embodiment. The about-the-market document, Judge, that would be about admission to booth spaces, again, vendors and buskers. That's a different form analysis. If we were going to discuss whether a booth at the farmer's market is a public forum, that's completely different. You could ban political and religious only. I believe that we could ban a lot of things from a non-public forum, and that if we're talking about the booths, then those are a non-public forum. But, as I said, that's a different analysis than what we're really talking about here. We're talking about the public ways. We're not talking about a booth because there's nothing in the record to suggest Mr. Denton – As long as he's not calling out, can he proselytize? Can he say – I mean, he's not specifically saying, hey, you in the red cap, but he's just saying, you know, faith is the answer. Can he say that out loud? Yes, Judge. He's allowed to go stand there on the sidewalk and say faith is the answer. Yes, Judge. And so what we're talking about and what the city's been attempting to do here is, essentially, the market historically has been disrupted by the following conduct. We've had pro-life protesters come into it. We've had pro-choice protesters come into it. We've had politicians come to try to campaign in there. We've had roving theater troops show up and try to do ad hoc performances. We've had picketers come in to block off sections of it. This is a messy thing. Yes, it is, Judge. And unfortunately, again, this area is – it's a handful of streets. It's a very narrow, small area. And so all of the booth spaces in this area are planned out very specifically. They're arranged for their operational needs. They're arranged to make sure that there's appropriate access, that there's not crowding, that emergency vehicles and personnel can get from one side of the market to the other if necessary. This is all done very specifically. Can a person pray out loud at the market? If they're not causing a disruption, Judge. So it's all decided after the fact on whether they're disruptive, not before the fact? The entire crux of the city's policy is to move disruptive conduct out of the way of the market. That's the entire crux of the policy. Well, essentially, it's the type of conduct that I was discussing. All those people that come in with essentially various different sort of First Amendment-related messages invade the market space and essentially they make it impossible for the market to operate in a safe and orderly fashion. The thing that the city is regulating here, as I said, it's embodied in the Fife Affidavit. It's not embodied in the About the Market document. The About the Market document is essentially not really very relevant to this case. And the reason it's not is because of this. Even if you're right because it doesn't apply to him individually? Correct. You'd have to undispute what you said was an undisputed fact. Right? The undisputed facts stated that you ban these categories of First Amendment activity. Correct, in the context of their sort of a non-exclusive list of disruptive conduct that has been dealt with in the past. So perhaps our language was not as exact there as it should have been, quite frankly, but that's an error of counsel. That's not a problem of facts. As I said, the About the Market document is just about what people are allowed to do in the market when they're vendors, buskers, those types of things. I know there's very little record here. Yes. You agree that if this is content-based, we don't even ask if you had a policy purpose. Correct. Under read, that would be. But your contention is the only evidence as to a purpose is to stop disruption. You're not hostile to any of the pro or anti messages. Correct. Pro-choice, pro-life. Correct. Religion plus, religion minus. There's nothing in the record that suggests El Paso had hostility to messages. Nothing that suggests we have hostility to messages, Judge, and there's nothing to suggest that essentially this regulation is really about content of speech at all. You say nothing in the record that there's hostility to messages. The About the Market policy itself on its face is hostile to messages, to religious proselytizing. Judge, again, I think that the About the Market document is really not what was applied to Mr. Dinh, and I understand what you're saying. There's nothing in the record that shows the city's hostile to a viewpoint. That's just not true. They have a policy related to this same fair that says no religious proselytizing on its face. Correct, Judge. In the context of what the market is about, it's an art and farmers market, so we don't put booths for First Amendment purposes. We put booths for people to sell farm produce. They put booths for people to sell art. And in the context of saying that we're not hostile to a message, I mean patrons in the market can talk amongst themselves about any topic that they'd like. But he wouldn't be disruptive if he just stands there with a stack of leaflets next to him, would he? Is that – so you're saying – let's say a panhandler's quiet, says nothing, has a sign, you know, I'm an Army vet. Correct. Or Mr. Denton's there, silent, but has his literature. They would be allowed? In the context of – so, as I said, patrons in the market, if he was coming into the market as a patron – Just answer my question. If they don't say anything, a lot of panhandlers just have signs. Correct. And let's say he has a literature, Christian literature, whatever religion he wants to espouse, would your policy allow those people? Because it's – Yes, Judge. Yes, Judge. Because he's not causing a disruption. Again, the crux of it is that we're targeting disruptions. The person in the booth, if they sell crystals, can they say, and this is a great thing to reach a higher spirit in your life? Yes, Judge. Would you recommend that? Well, isn't that religious proselytizing? No, not as I would understand it. You said this helps you reach the – some kind of self-realization of faith. But for yourself, you don't have to worship an outside deity, do you, to be religious proselytizing? No, Judge. So why isn't that religious proselytizing? These crystals help you get at one with the universe. So, again, I think we're more talking about the market document and not really what we believe the policy was. But to answer your question directly, Judge, I don't think that that's a problem at the market. Artists there could – they could paint and sell religious iconography if they wanted. The city doesn't have a problem with that. That's not the type of conduct that our regulation is tailored toward. Is that not religious proselytizing? To the extent that someone may have a religious message, I guess, Judge. But what we're talking about when we say religious proselytizing like that is essentially people trying to gather a crowd around them for what is a public speech. That's the type of conduct that we're trying to avoid. We're trying to avoid people coming into the market, making a crowd, and doing that in order to deliver some message that isn't related to the operation of the market itself. And that's the policy that we're talking about here. It's not – it doesn't chase Mr. Denton around outside of the market either. He was asked to move approximately 50 feet away from where he was speaking, and he could have done everything that he wanted to do over there. But he wanted his first and best choice, which is – that's not what the law is. The First Amendment never meant that a person has a right to speak wherever or whenever they would like, and there can be reasonable time, place, and manner restrictions on the exercise of that liberty. This restriction we're talking about, it's not overbroad. It doesn't burden speech unnecessarily, as we're discussing here, Judge. If we concluded speech-specific, would you contend that you might survive strict scrutiny, or would you acknowledge at that point it would be invalid? It's very rare that any type of – I don't have to tell you, Judge. It's very rare that any type of governmental activity regulating speech, if it has strict scrutiny applied to it, survives. We believe this is essentially a ward v. rock against racism, time, place, and manner restriction. We believe it's – if you decide otherwise, Judge, then in essence there I think if we have strict scrutiny applied to this, we have to get to a compelling interest, and I don't know if the city would be able to do that, but we would certainly argue that the point of this regulation is to allow the farmer's market to take place in an orderly fashion and in a safe fashion, and certainly the city is going to do everything that it can to make that happen. But I understand. Would the city be opposed to an injunction against the thing that it says it's not its new policy or it wasn't its policy to begin with? I mean if he's asking for an injunction against that free speech policy that he believes is the policy, you don't think that's your policy anyway, so how are you harmed? So in essence, Judge, the public interest here is kind of what we're talking about. We believe it's served by allowing us to preserve the ability of all of our citizens to enjoy the benefits that public spaces have to offer and that public events have to offer. How does that work if you don't think that's your policy? So in essence, Judge, if we pre-plan the market, set up booth spaces, and we have booth spaces, again, planned for people who've applied, this is their livelihood, this is how they make a living, and someone else shows up and stands where that booth is supposed to be, what's the city supposed to do? That's the crux of this case. What's the city supposed to do when it has a pre-planned event, a parade set to go down the street, and people get in the way of it? I don't think it's in his case that he's blocking the booth. No, Judge. What Mr. Denton did, and it's in the record, at roughly 2.50, he said he wanted to come in and draw a crowd about him for a public speech. The court recognized that that was part of what his activity was. That's the type of conduct, as I said earlier, that the city is trying to move out of the way of the farmer's market. Anyone who can come in and invade that space, if they do so in a disruptive manner, we're asking them to take their activity roughly 50 feet away to one of the market entrances, where they can do exactly what they want to do. You want to draw a crowd. If he wants to draw a crowd, if he wants to deliver any kind of public speech, those type of activities. You're not allowing him to speak about his faith. No, Judge. You're enjoying your alleged prohibition about him speaking on his faith. Well, Judge, there would be no need. He could do what he wants to do, either 50 feet away outside the market, or if he just wants to be a patron of the market and talk to willing people who want to discuss it with him. Again, what he was doing, Judge, was setting up an area, reserving an area for himself to conduct a public speech. No one's allowed to do that in the market. He would be essentially invading a small market to generate a crowd about himself. That's the conduct that we're asking to move out of the way. It's not about his message. The city has really very little interest in his message. What we want is we want him to deliver his message in a way that preserves that area for use by others as well. This is an odd record. Yes, Judge, it is. I do agree. Thank you. You've saved time for rebuttal. Yes, Your Honor. Just to attempt to try to clarify some things in a record, what the record shows is that in the about the market document, which is a guideline for activities at the market, it says that the market is not a venue for religious proselytizing, political campaigning, and fundraising. And then in interpreting this and applying this, the city has voiced a concern about what they perceive to be disruptive conduct. In this, they categorize these three things, religious proselytizing being one of them, as being automatically disruptive, no matter the form. And that's how it was applied on August 24, 2019, where Mr. Denton, before he really even had a chance to be disruptive, was stopped because Mr. Acosta knew that he was about to proselytize. And so at that very moment, he said, no, you cannot proselytize here. Do you mean he was stopped for not proselytizing by the enforcement person, not stopped because he was blocking the space for the person to set up their booth? No, Your Honor. He was not blocking. He was actually in an alleyway that was not in front of a tent. So was he told he's in the way, or was he told not proselytize? So not proselytize. And that's a stipulated fact, a stipulated fact of Paragraph 8 of the stipulation, is that on that day, he was stopped per the proselytizing rule. That was a rule that was invoked by Mr. Acosta on behalf of the city. But remember that that rule doesn't apply to people who don't have a booth. It applied to Mr. Denton that day, and the city has defended its ability to do that in this litigation. And then also what the city has done is it has a rule that says it bans leafletting. That is found in the document as well, that it specifically says there's no leafletting outside of the booths. Did the city say that that's for the booth people, or they say that's for the consumers? Yeah, it's for individuals outside the booths, is that they cannot leaflet. And they admit that in the answer as found, I believe, on Paragraph 65 of the answer, that they admit that they do ban leafletting, and they ban speech as well as part of their overall policy. And so what we have here, I believe, is a violation of free speech. It's a violation of free exercise of religion. And also because of the First Amendment activities and something that you hit on, Judge Elrod, just sort of the difficulty in trying to put parameters around something that broad, I believe it also raises due process concerns because a person really doesn't have fair notice as to whether or not they're violating something that could subject them to criminal arrest. It's a prior restraint of speech that's vague. It is. It is. It's hopelessly vague. And so I believe that, along with the free speech and the free exercise of religion, have three constitutional violations at play here, which I believe has been substantially shown. And so that's the first prong of a preliminary injunction is to establish a substantial likelihood of success on the merits, which I believe is done here. Also, because it involves constitutional freedom, Your Honor, it invokes irreparable harm. ...to say enter the injunction. I mean, it seems like that's what the brief says. Wouldn't it be also suitable just if, assuming arguendo that we agree with you, and please don't go overshadowing, to send it back and say this appears to be, the record seems to say this. Please analyze this under the stipulated facts. I believe what's appropriate here, particularly in the light of the urgency of a preliminary injunction, and the market is ongoing, is to instruct the district court to grant the preliminary injunction. And the market is ongoing in this time? It has. It started back up. And so it's going on a weekly basis, and so Mr. Denton would like to get there back as soon as possible. And so that's the request that we're seeking on this appeal. And unless there's any further questions, thank you for your consideration. Thank you. I can go one more.